939 F.2d 260
 56 Fair Empl.Prac.Cas. 1051,
57 Empl. Prac. Dec. P 40,942,
33 Fed. R. Evid. Serv. 1034
Elizabeth WILSON, Plaintiff-Appellant,
v.
ZAPATA OFF-SHORE COMPANY, Defendant-Appellee.
Elizabeth WILSON, Plaintiff-Appellant,
v.
ZAPATA OFFSHORE, Defendant-Appellee.
 No. 89-2825.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 19, 1991.
 
 John L. Maxey, II, Jackson, Miss., Wynn E. Clark, Owen, Galloway & Clark, Gulfport, Miss., for plaintiff-appellant.
 Chris A. Lorenzen, Crain, Caton, James & Womble, Houston, Tex., for defendant-appellee.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GARWOOD and WIENER, Circuit Judges, and VELA[1], District Judge.
 GARWOOD, Circuit Judge:
 
 
 1
 Plaintiff-appellant Elizabeth Wilson (Wilson) originally filed two actions against her former employer, defendant-appellee Zapata Off-Shore Company (Zapata). The first, filed October 9, 1984, alleged a claim for sex discrimination under 42 U.S.C. Sec. 2000e et seq. (Title VII); and the other, filed August 6, 1987, alleged Jones Act (46 U.S.C.App. Sec. 688) and general maritime law claims for emotional distress. These suits were subsequently consolidated for trial simultaneously before the bench and a jury, respectively. Wilson suffered a take-nothing judgment in each suit and has raised issues on appeal challenging both judgments. Finding no reversible error, we affirm.
 
 Facts and Proceedings Below
 
 2
 Wilson worked for Zapata between 1980 and 1984. During that time, she was quickly promoted through several positions to her final position as Motorhand A at more than double her starting salary. Wilson left Zapata in October 1984 because she was experiencing emotional problems, which she claims were caused by a hostile work environment aboard the rig. She was admitted to Riverside Hospital in Jackson, Mississippi on October 16, 1984, where she was treated for anxiety-related disorders. Following her discharge from the hospital in November 1984, Wilson continued to seek psychiatric counseling, and she did not hold a steady job for over two years.
 
 
 3
 Wilson alleges that she was "the object of sexual advances [by male co-employees] almost from the beginning of her employment on the rig." She claims that when she fended off these unwelcome advances, the men tried to use their authority to demote her or to see that she did not receive certain promotions. In March 1984, Wilson complained to the EEOC that she was discriminated against in promotion decisions and was subjected to sexual harassment. These allegations later formed the basis of her Title VII complaint. Meanwhile, on July 12, 1985, Wilson filed a Longshore and Harbor Workers' Compensation Act (LHWCA)[2] claim for compensation against Zapata based on allegations similar to those described above. The administrative law judge rendered a decision on September 30, 1986, denying benefits because Wilson was a seaman and thus covered under the Jones Act, not the LHWCA. Wilson filed an appeal, which was dismissed on October 28, 1987. The LHWCA claim has not been pursued further.
 
 
 4
 While the appeal was pending in her LHWCA suit, Wilson filed suit against Zapata under the Jones Act, claiming that Zapata negligently permitted the male crew to create a hostile work environment that led to her eventual nervous breakdown. Because Jones Act suits are subject to a three-year statute of limitations,[3] the district court directed a verdict on all acts, omissions, and conduct occurring before August 6, 1984 (three years prior to the date the Jones Act suit was filed), and prohibited the jury from considering substantively any conduct before that date. The court did, however, permit evidence concerning prior conduct of Zapata's crew toward Wilson to be admitted for the purpose of showing Wilson's condition or propensity to injury. At trial, Wilson presented extensive testimony, spanning her entire career with Zapata, recounting numerous incidents that she claimed constituted harassment. In addition to the testimony describing incidents prior to the bar date, Wilson also testified that while on the job she was fondled and grabbed by two male co-employees within the limitations period. Zapata, on the other hand, denied that Wilson had been subjected to a hostile work environment. The men Wilson accused of sexually harassing her denied the incidents alleged, and explained their actions of seeking demotions or filing reports criticizing Wilson's work on the ground that Wilson had been promoted too quickly and was unable to adequately perform as Motorhand A. The Zapata witnesses admitted that Wilson might have been subjected to "heckling" or practical jokes, but asserted that the heckling was "good natured" and usual practice on board such rigs. This observation was specifically confirmed by Wilson's female co-employee roommate on board the rig, who further testified that Wilson herself frequently engaged in this sort of teasing. In closing argument, Zapata implied that Wilson's emotional breakdown was attributable to several factors outside the work environment. Wilson had been seeing a married man for some time, and gave birth to his child out of wedlock. Unsurprisingly, Wilson's relationship with this man was turbulent. In addition, Wilson had a history of gastrointestinal problems prior to her association with Zapata.
 
 
 5
 After hearing all of this evidence, the jury found that Wilson had not been injured within the limitations period. In accordance with the jury's findings, the district court entered a take-nothing judgment on the Jones Act claims on May 2, 1989. The Title VII claims were tried simultaneously to the bench, and the district court issued findings of fact and conclusions of law, which stated that Wilson had not been subjected to sexual harassment or discrimination. Accordingly, on July 19, 1989, the district court entered a take-nothing judgment on the Title VII claims. Wilson has raised issues on appeal relating to both judgments.
 
 Discussion
 I. Jones Act Claims
 A. Sexual harassment under the Jones Act
 
 6
 Although Zapata did not raise this issue below or in its brief, Zapata has subsequently brought to this Court's attention[4] the recent Sixth Circuit opinion in Griggs v. National Railroad Passenger Corporation, Inc., 900 F.2d 74 (6th Cir.1990), which held that a worker's claim of sexual harassment is not cognizable under the Federal Employers' Liability Act (FELA).[5] Because the Jones Act incorporates by reference the FELA,[6] Zapata asserts that Wilson's claim is also barred, and urges this Court to adopt the Sixth Circuit's position.
 
 
 7
 The Griggs decision is apparently the only circuit court decision on this issue. In Griggs, the plaintiff alleged that her employer, Amtrak, had negligently permitted racial and sexual harassment to occur; as a result, she claimed to have suffered from, among other things, depression and migraine headaches. However, the plaintiff made only general allegations and did not detail the racial or sexual occurrences. Observing that "the facts alleged by the plaintiff are those of which Title VII claims are made," the court concluded that "plaintiff's claims are not cognizable under the FELA." Griggs, 900 F.2d at 75. The court reasoned that the FELA was designed not to create new substantive torts but to protect railway workers in federal court from common law torts. Id. The discrimination alleged by the plaintiff, however, created federal liability only because of Title VII; sexual harassment per se was not a tort at common law. Id. Moreover, allowing workers to bring sexual harassment claims under the FELA would "permit evasion of the detailed and specific enforcement scheme created by Title VII to vindicate statutorily proscribed employment discrimination." Id. Accordingly, the court affirmed summary judgment in favor of the defendant railroad. Id. at 77.
 
 
 8
 This Circuit has recognized that "[c]ourts have long allowed plaintiffs to recover for psychic and emotional harm in Federal Employers' Liability Act or Jones Act/maritime cases." Hagerty v. L & L Marine Services, Inc., 788 F.2d 315, 318 (5th Cir.), modified, 797 F.2d 256 (1986).[7] In particular, the Hagerty court cited the Ninth Circuit's opinion in Buell v. Atchison, Topeka & Santa Fe Railway Co., 771 F.2d 1320, 1324 (9th Cir.1985), aff'd in part, vacated in part, 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), which recognized a claim for purely emotional injury resulting from the employer's negligent and intentional harassment, threats, and intimidation. This view arguably finds support in Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), where the Supreme Court observed:
 
 
 9
 "The wording [of the FELA] was not restrictive as to the employees covered; the cause of the injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting.
 
 
 10
 "To read into this all-inclusive wording a restriction as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court." Urie, 69 S.Ct. at 1030.
 
 
 11
 A recent district court opinion considered but rejected application of Griggs to facts similar to those now before us. In Masiello v. Metro-North Commuter Railroad, 748 F.Supp. 199 (S.D.N.Y.1990), the court considered the Jones Act claims of a female engineer who claimed to have suffered emotional and physical injuries, including an ulcer, as a result of mental and physical harassment on the job. The court distinguished Griggs on the grounds that the plaintiff in Griggs had not made allegations of physical harassment; the court further found the reasoning in Griggs to be unpersuasive because the Sixth Circuit failed to follow the Urie directive to construe the FELA broadly and not limit the type of injuries for which a person may recover under the Act.
 
 
 12
 We find Griggs inapposite on the present facts. Although Wilson's Jones Act complaint is quite terse and does not detail the allegations upon which her suit is founded, we do, unlike the Griggs court, have the benefit of a full and complete record. We decline to hold that Wilson's claims of harassment are not cognizable under the Jones Act. We assume that the Jones Act does not cover conduct that is wrongful only by virtue of the provisions of Title VII. However, the record before us reveals that Wilson has claimed more than conduct which is wrongful only because it was motivated by a bias against the victim on account of her sex. Rather, Wilson's evidence tended to show harassment, both physical and otherwise, resulting in physical and emotional injury. There is evidence indicating that she suffered physical manifestations of harm, including weight loss, vomiting, and diarrhea. In addition, Wilson testified to incidents of unwanted physical contact instigated by her male co-workers, contact which in some instances amounted to a common-law battery. Such conduct could be found wrongful even if Title VII had never been enacted and without regard to concepts of sex discrimination. These assertions of tortious physical contact and significant physical injury are sufficient to create a claim for harassment,[8] which this Circuit has recognized as cognizable under the Jones Act. See Hagerty, supra. Accordingly, we now turn to the merits of Wilson's Jones Act appeal.
 
 B. Statute of limitations
 
 13
 The district court directed a verdict on all acts, omissions, and conduct occurring before August 6, 1984 (three years prior to the date the Jones Act suit was filed). The first interrogatory to the jury asked whether "Wilson [was] injured on the job after August 5, 1984," which the jury answered, "No." By answering the first question in the negative, the jury did not reach the subsequent questions. Wilson presents three grounds for reversing the district court's directed verdict on the limitations issue.
 
 
 14
 A motion for directed verdict presents the district court with a question of law, Glazer v. Glazer, 374 F.2d 390, 400 (5th Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967), which we review de novo. Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Moreover, although Wilson discusses at length the exacting standard applied to taking factual issues from the jury,[9] we believe the present statute of limitations issue involves questions of law, not of disputed material facts.
 
 1. Equitable tolling by LHWCA claim
 
 15
 In a case of first impression, we must address Wilson's argument that the Jones Act statute of limitations should have been tolled by her pursuit of a LHWCA claim, which was ultimately denied on jurisdictional grounds.[10] Wilson relies on Burnett v. New York Central Railroad Co., 380 U.S. 424, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965), which held that the filing of a FELA action in a court of improper venue tolls the FELA limitation provision. The Court noted that the basic question to be answered in determining whether the statute of limitations should be tolled is "whether congressional purpose is effectuated by tolling ... in [the] given circumstances." Id. 85 S.Ct. at 1054. The Court's analysis in Burnett stemmed from its earlier decision in Herb v. Pitcairn, 325 U.S. 77, 65 S.Ct. 954, 955, 89 L.Ed. 1483 (1945), in which the Court concluded that when process has been adequate to bring in the parties and commence judicial handling of a case that could lead to final judgment without issuance of new initial process, the action has been "commenced" within the meaning of the FELA limitation provision (45 U.S.C. Sec. 56). See Burnett, 85 S.Ct. at 1059 (Douglas, J., concurring). However, as Zapata aptly notes, Burnett involved a claim dismissed for improper venue, whereas Wilson's LHWCA claim was dismissed for lack of jurisdiction. Arguably, the Court's "commencement" analysis falters where a claim has been dismissed for lack of jurisdiction.
 
 
 16
 This Circuit has addressed, but not yet resolved, the issue of whether the Jones Act statute of limitations may be tolled by pursuit of a Jones Act claim that was denied on jurisdictional grounds. Covey v. Arkansas River Co., 865 F.2d 660, 662 (5th Cir.1989). Noting that the plaintiff had not diligently pursued her claim, the Covey court declined to decide the issue, holding that the plaintiff had failed to demonstrate her entitlement to equitable tolling. Id. In considering the issue, the Covey court cited Platoro Limited, Inc. v. Unidentified Remains of a Vessel, 614 F.2d 1051, 1054-55 (5th Cir.), cert. denied, 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 131 (1980), in which this Court relied on the Supreme Court's reasoning in Burnett to toll the statute of limitations in an action that was originally filed in a court that lacked jurisdiction. Platoro did not involve the Jones Act. However, given the Jones Act's purpose of protecting seamen, see The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 711, 80 L.Ed. 1075 (1936), Wilson contends that Congressional purpose would be effectuated by tolling in the instant case.
 
 
 17
 Statutory limitation periods are " 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' " American Pipe and Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974) (quoting Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)). The theory is that even if the plaintiff has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation. Id. In each of the cases Wilson cites in support of her tolling theory, the improperly filed, but timely, suit involved the same statutory claims as the later suit, giving the defendant fair notice of the exact nature of the plaintiff's claims. In contrast, Wilson's claims under the LHWCA are not the same as her present Jones Act claims. Unlike the Jones Act, the LHWCA is a type of workers' compensation statute; the injured employee need not prove fault in order to recover.[11] Moreover, the nature and extent of the available recovery differs sharply as between the LHWCA and the Jones Act. Finally, the LHWCA claim did not involve the institution of any court proceedings. Therefore, the cases relied on by Wilson are inapposite. When Zapata received notice of administrative proceedings under the LHWCA, it was not adequately put on notice of defending a damage suit against it under the Jones Act based on negligence.
 
 
 18
 Given the policies favoring limitation periods, federal courts have typically extended equitable relief only sparingly. Irwin v. Veterans Administration, --- U.S. ----, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990). For example, courts have been willing to apply equitable tolling in cases where the claimant has actively pursued judicial remedies by filing a timely but defective pleading, Burnett, supra; or where the claimant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass, Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). Courts have been less willing, however, to apply equitable tolling in situations where the claimant's delay in seeking a judicial remedy resulted from his choice to pursue administrative relief first. In Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 1722-24, 44 L.Ed.2d 295 (1975), the Supreme Court denied equitable tolling to a civil rights complainant who allowed the filing deadline under 42 U.S.C. Sec. 1981 to lapse while he pursued administrative proceedings under Title VII before the Equal Employment Opportunity Commission (EEOC). Although it observed that refusing to toll would have the effect of pressing civil rights complainants into premature and expensive litigation that could destroy opportunities for administrative conciliation, the Court nevertheless found "no policy reason that excuses [plaintiff's] failure to take the minimal steps necessary to preserve each claim independently." Id. 95 S.Ct. at 1723. Because the plaintiff faced no barriers to filing his section 1981 action at any time after his cause of action accrued, the Court noted that "in a very real sense, [plaintiff] has slept on his Sec. 1981 rights" by not filing during the pendency of the EEOC proceedings. Id. We are arguably presented with a closer question than that addressed by the Supreme Court in Johnson, as the present case involves mutually exclusive claims for relief. However, we do not think that a different result should attend where the error in choosing appropriate relief lies with the plaintiff; moreover, the plaintiff could have filed a timely, protective Jones Act claim. At some point, the right to be free of stale claims comes to prevail over the right to prosecute them. See American Pipe, supra, 94 S.Ct. at 766.
 
 
 19
 We reject Wilson's arguments for equitable tolling by virtue of her LHWCA claim.
 
 2. Discovery rule
 
 20
 Wilson argues, alternatively, that the "discovery rule" should be applied, and that the district court erred by not allowing the jury to decide when she discovered her injury. One of the leading cases in this Circuit on limitations analysis in Jones Act cases is Albertson v. T.J. Stevenson & Company, Inc., 749 F.2d 223 (5th Cir.1984). In Albertson, this Court held that in most personal injury cases the "time-of-event rule" should be applied, in which case the limitations period runs from the time of the injury. Id. at 229. If, however, the plaintiff has sustained "a latent injury which either is not or cannot be discovered until long after the tortious act that caused the injury has occurred ... courts have routinely applied the so-called discovery rule...." Id. In seeking to establish a clear framework for limitations analysis, the Albertson court distinguished two types of latent injury cases: pure latent injury cases, in which the plaintiff is not even aware of the injury until much later; and traumatic event/latent manifestation cases, in which the plaintiff sustains both immediate and latent injuries caused by a noticeable, traumatic event. Id. at 229-31. The discovery rule applies only to the former type. Id. at 232 n. 8. See also Armstrong v. Trico Marine, Inc., 923 F.2d 55, 58 (5th Cir.1991). Thus Wilson argues, as she must, that her injury was a pure latent injury.
 
 
 21
 We find Wilson's argument for application of the discovery rule to be without merit. The law in this circuit requires application of the time-of-event rule "whenever the plaintiff is aware of or has had reasonable opportunity to discover 'the critical facts of [the] injury and its cause.' " Clay v. Union Carbide Corp., 828 F.2d 1103, 1106 (5th Cir.1987) (quoting Albertson, 749 F.2d at 233). See also Crisman v. Odeco, Inc., 932 F.2d 413, 415-16 (5th Cir.1991). If Wilson was harassed, she was certainly aware of it. In fact, she demonstrated such an awareness by filing an EEOC complaint in March 1984, and a Title VII suit in October 1984. Although she was not formally diagnosed as having "post-traumatic stress disorder" until October 1984, testimony adduced at trial indicated that Wilson knew as early as December 1983 that she was experiencing stress. During her hospitalization in November 1984, Wilson related to her psychiatrist that since her boss threatened to fire her in December 1983 for seeing her boyfriend, she began to have more and more difficulty with anxiety and stomach pains. When Wilson was hospitalized for the first time, in late July 1984, Wilson complained of stomach and other physical problems, which she indicated were intensified by stress on the job dating back several months. Wilson's case thus presents facts very similar to those in Albertson and Clay, where the seamen were exposed to chemicals and experienced immediate symptoms but did not realize the full extent of their injuries until later. In both cases, this Court held that the fact that the plaintiffs lacked knowledge of all of the alleged consequences of their injuries did not justify a departure from the time-of-event rule. Albertson, 749 F.2d at 233; Clay, 828 F.2d at 1106-07. No different rule should apply in Wilson's case, where she has acknowledged immediate suffering from the intentional actions of Zapata's crew. The lack of diagnosis of post-traumatic stress disorder until October 1984 does not change the result, as we clearly held in the closely analogous Armstrong case. Accordingly, we affirm the district court's application of the time-of-event rule for determining the running of the limitations period.
 
 3. Continuing Tort
 
 22
 Wilson also argues that her harassment by several members of Zapata's crew constituted a continuing tort such that her cause of action did not accrue until the date of the last act, which was September 1984. She cites cases that hold generally that when an injury is caused by continuing or repeated acts, the statute of limitations may be tolled until the last day the employee was subjected to the conditions causing the injury. See Fletcher v. Union Pacific Railroad Co., 621 F.2d 902, 908 (8th Cir.1980), cert. denied, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981). The case cited by Wilson with the most similar facts is Illinois Central Gulf RR Co. v. Boardman, 431 So.2d 1126, 1128 (Miss.1983). In Boardman, the plaintiff suffered on-the-job stress for several years, and eventually collapsed. The Mississippi Supreme Court applied the Fletcher court's reasoning, holding that the plaintiff's claims did not accrue until after his condition was diagnosed. Id. Wilson's case is clearly different. Unlike Boardman, Wilson's claim is for stress that did not result from the nature of her job or any policy or rule of Zapata, but rather from specific, affirmative acts of harassment by diverse co-workers. Wilson complained on numerous occasions about the way she was treated, and she was aware of her symptoms as early as December 1983.
 
 
 23
 We conclude that Wilson's reliance on the continuing tort doctrine is misplaced. The district court did not bar Wilson's entire cause of action, but merely recovery for injuries sustained outside the limitations period. If Zapata's conduct truly constituted a continuing tort, the jury would have found that Wilson was injured after August 5, 1984. However, the jury found that Wilson did not sustain an injury after that date. We reject Wilson's argument that her claims all accrued in September 1984.
 
 4. Conclusion
 
 24
 In conclusion, we hold that the district court properly directed a verdict in favor of Zapata for all conduct occurring more than three years before Wilson filed suit under the Jones Act, and properly instructed the jury to allow recovery only for injuries sustained after that time.
 
 
 25
 C. Jury charge on aggravation of a pre-existing condition
 
 
 26
 Wilson's objection to the jury charge is apparently two-fold. We first address Wilson's complaint that the district court failed to hold a formal charge conference prior to allowing the jury to retire. Federal Rule of Civil Procedure 51 requires that a party wishing to preserve error on a jury charge must object "before the jury retires." Therefore, this Court has held that the district court must give the parties an opportunity to make objections to the charge before allowing the jury to retire. Doucet v. Gulf Oil Corp., 783 F.2d 518, 523 (5th Cir.), cert. denied sub nom. Gulf Oil Corp. v. Danos & Curole Marine Contractors, Inc., 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). Wilson argues that the district court below did not afford her counsel such an opportunity, but rather ordered counsel to make objections "later." A fair reading of the record indicates that Wilson's counsel felt compelled to reserve formal objections until after the jury retired, at which point Wilson's counsel did raise objections to the omitted charges on which she now assigns error.[12] We disagree, however, with Wilson's contention that the failure to hold a formal charge conference before the jury retires is per se reversible error. Rule 51 does not automatically invalidate a charge simply because formal objections were not entertained before the jury retired; the Doucet opinion indicates merely that the failure of the court to allow objections before the jury retires will excuse counsel from following the formalities of Rule 51. See Doucet, 783 F.2d at 523. Further, Wilson's assertion that the formal charge conference was held after the jury retired is somewhat misleading. Wilson's counsel had opportunity throughout the trial to make clear his position on the continually evolving jury charge. In particular, with regard to the charge on aggravation, Wilson's counsel submitted instruction P-15, the omission of which Wilson now assigns as error, and discussed its inclusion with the court. The court acknowledged Wilson's position by stating, "All right. I will see if there is anything more extensive that I need. But now essentially I want to give them what the law is, and that is aggravation is recoverable but compensation for earlier injury is not recoverable...." Accordingly, we find that the court gave counsel ample opportunity to make objections to the charge before the jury retired, and we reject Wilson's claim of reversible error regarding the district court's refusal to hold a formal charge conference before the jury retired.
 
 
 27
 Addressing the substance of the charge, we note that parties are not entitled to have the jury instructed in the precise language or form they suggest. Pierce v. Ramsey Winch Co., 753 F.2d 416, 425 (5th Cir.1985). Rather, a reviewing court will reverse only if the charge leaves it with "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." Id. Wilson asserts that the jury was improperly guided because the district court failed to adequately charge the jury that an aggravation of a pre-existing condition is an "injury." We need not address whether the law supports Wilson's contentions because Wilson's counsel never made such an objection below. The only objections directed toward interrogatory number 1, which defined injury,[13] were related to the court's decision to deny recovery for any injury resulting from acts occurring outside the limitation period; that is, prior to August 5, 1984. We have already determined that such a decision did not constitute error. In fact, Wilson's counsel fully embraced the court's definition of injury at trial, as exhibited by the following exchange:
 
 
 28
 "THE COURT: All right. How about this? An emotional affront without physical impact is an injury if it has serious consequences similar to those resulting from a physical injury?"MR. CLARK: I think that's pretty accurate."
 
 
 29
 Further, we will not reverse if we conclude, based upon the entire record, that the challenged instruction would in all likelihood not have affected the outcome of the case. Bass v. USDA, 737 F.2d 1408, 1414 (5th Cir.1984). Wilson's proposed instruction P-15 was submitted in conjunction with special interrogatory number 9, which covered damages.[14] Significantly, the proposed instruction requested by Wilson describes aggravation as a damages rather than an injury concept, stating that should the "verdict be for the Plaintiff," Wilson is entitled to recover from Zapata to the extent that Zapata aggravated a "pre-existing mental or physical condition" of Wilson, that is, "any condition which already existed before the incidents began in this case." Therefore, the inclusion of Wilson's proposed charge on aggravation would not have affected the outcome of the case; it would have remained unanswered because the jury did not render a liability verdict for Wilson.
 
 
 30
 We conclude that Wilson's contentions with respect to the jury charge present no reversible error.
 
 D. Admission of hospital record
 
 31
 Wilson next challenges the district court's refusal to exclude portions of hospital records reporting a statement by Wilson's sister, Laird, to a social worker, who recorded that "informant reports that the patient is a habitual liar and has been all of her life." Wilson objected at trial on grounds that the evidentiary foundation had not been made under Fed.R.Evid. 803(6) (specifically, that Zapata had failed to establish that the records were accurate); that the statement was multiple hearsay under Fed.R.Evid. 805; and, if otherwise admissible, the statement was unduly prejudicial under Fed.R.Evid. 403. Wilson renews these objections on appeal.
 
 
 32
 Wilson is correct that the hospital record contains double hearsay. Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). United States v. Baker, 693 F.2d 183, 188 (D.C.Cir.1982). However, if the source of the information is an outsider, as in the facts before us, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have. See United States v. Davis, 571 F.2d 1354, 1360 (5th Cir.1978). Further, Federal Rule of Evidence 805 requires that all levels of hearsay satisfy exception hearsay requirements before the statement is admissible.
 
 
 33
 Rule 803(6) provides a hearsay exception for records kept in the course of any regularly conducted business activity, which would include hospitals. See Advisory Committee's Notes on Federal Rule of Evidence 803(6), 28 U.S.C.App., p. 723; Ricciardi v. Children's Hospital Medical Center, 811 F.2d 18, 22 (1st Cir.1987). The admissibility of hospital records under this exception is supported by the presumption of reliability that attaches to statements relating to treatment and medical history in such records. Ricciardi, 811 F.2d at 22.
 
 
 34
 Wilson complains that a proper foundation was not laid for the admission of the records. An affidavit of the custodian of records of Dr. Debra Rogers, who is listed as the psychiatrist on the disputed report, was submitted in connection with the social worker's report.[15] The affidavit contains statements that track the language of Rule 803(6) nearly word for word. Although Wilson is correct that the affidavit does not contain a statement verifying the accuracy of the report, Rule 803(6) does not require testimony that the record is accurate. As this Court has previously held, "Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records." Rosenberg v. Collins, 624 F.2d 659, 665 (5th Cir.1980) (emphasis added). The district court has discretion in ascertaining the admissibility of business records, and its ruling should be disturbed only when that discretion is abused. Id. We conclude that no abuse of discretion has been shown here.
 
 
 35
 The second level of hearsay presents a closer question. The out-of-court statements by Laird were offered to prove the truth of the matter asserted, and thus were classic hearsay. Zapata argues that Laird's statements fall within Fed.R.Evid. 803(4), which excepts from the hearsay rule statements made for purposes of medical diagnosis or treatment. The test, when examining whether statements contained in medical records relating to a patient's condition are admissible hearsay, is whether such statements are of the type pertinent to a physician in providing treatment. Cook v. Hoppin, 783 F.2d 684, 690 (7th Cir.1986). Courts have construed Rule 803(4) to include statements made for psychiatric diagnosis. See, e.g., Morgan v. Foretich, 846 F.2d 941, 949 (4th Cir.1988) (allowing statements made by child abuse victim to psychiatrist). See also Kaufman v. Kaufman, 164 F.2d 519, 520 (D.C.Cir.1947). Moreover, Rule 803(4) does not always require that the out-of-court statements refer to the condition of the declarant. McCormick, McCormick on Evidence, Sec. 292 at pp. 840-41 (1984). It is apparent that the treating psychiatrists in this case were concerned with learning about Wilson's background, lifestyle and history of psychiatric treatment. Further, it was obviously important for the psychiatrists to know whether Wilson was a credible informant. Statements by Wilson's sister, recorded two days after Wilson's admission to the hospital, could be appropriate and helpful background information for the psychiatrists to consider in the diagnosis and treatment of Wilson's complaints. The value of the statements, however, would appear to be somewhat compromised by their total generality and conclusory nature.
 
 
 36
 Wilson also asserts that even if the hospital records were admissible, they were unduly prejudicial and should have been excluded under Federal Rule of Evidence 403. For the reasons noted above, we doubt that the statements had much of real value to contribute, though by the same token it does not appear that the records would likely influence the jury to make its decision on an improper basis.
 
 
 37
 We pretermit determination of whether admission of the records was error. Even it were, we will not reverse if we find that the error was harmless. Fed.R.Civ.P. 61; Fed.R.Evid. 103. We conclude that it is highly probable that the admission of these medical reports did not affect Wilson's substantial rights. We note that Wilson's sister was called to testify and denied making the statements to the social worker. There was abundant other evidence casting serious doubt on Wilson's credibility, as well as directly contradicting her version of the crucial events on which she based her suit.E. Conclusion
 
 
 38
 We affirm the district court's judgment with respect to Wilson's Jones Act claims, including the denial of her motion for new trial.
 
 II. Title VII Issues
 Findings of Fact and Conclusions of Law
 
 39
 Federal Rule of Civil Procedure 52(a) requires a court trying an action without a jury to "find the facts specially and state separately its conclusions of law thereon...." This Circuit has "routinely reversed a trial court that has failed to set forth sufficient findings of fact and conclusions of law in actions under Title VII." Ratliff v. Governor's Highway Safety Program, 791 F.2d 394, 401 (5th Cir.1986). Wilson argues that the district court's findings are inadequate because they "are essentially a series of one-sentence conclusory statements with no explanations or subsidiary facts to base the conclusory statements." This point is without merit. The district court made 28 findings of fact, which spanned Wilson's entire career with Zapata. The court specifically found that once Wilson was promoted to the position of motorhand, her work performance became "erratic," and she was unable to perform satisfactorily. Further, the court found that as Wilson's "inability to do the work became increasingly apparent, she began attributing her ineptness to co-worker harassment based on sex." The court concluded that Wilson was not subjected to sexual harassment or discrimination, and was not retaliated against for filing her EEOC complaint. These findings "at least refer to the evidence tending to prove and disprove the merits of [the employer's] proffered explanation and state why the court reached the conclusion...." Ratliff, 791 F.2d at 401. The district court was not "required to make specific findings on every bit of evidence in the record." Washington v. Patlis, 916 F.2d 1036, 1037 (5th Cir.1990).
 
 
 40
 Wilson further alleges that the district court failed to recognize the elements of sexual harassment in the context of a hostile environment. If the district court operated under an erroneous conception of the law regarding sexual harassment in the work environment, its findings cannot stand. See Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374, 1382 (5th Cir.1978), cert. denied sub nom. United Steelworkers of America v. Parson, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1982). The Supreme Court has recognized that "[s]exual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 902 (1982)). Contrary to Wilson's assertions, the district court did act properly. The court specifically found that "[n]othing in the mixture of Wilson's private and work lives was sexual harassment...." Although Wilson alleged numerous occasions of purported sexual advances, the district court, as the arbiter of Wilson's credibility, was free to disbelieve her, especially since the supposed perpetrators testified and denied the actions. The record makes plain that this finding is not clearly erroneous. Since the district court found that Wilson was not subjected to any sort of sexual harassment, it necessarily follows that there was no harassment with which to create an abusive work environment. Thus, Wilson's contention that the district court failed to apply the correct definition of a hostile and abusive work environment is without merit.
 
 Conclusion
 
 41
 For the reasons stated, the judgments of the district court are
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 District Judge of the Southern District of Texas, sitting by designation
 
 
 [2]
 33 U.S.C. Sec. 901 et seq
 
 
 [3]
 The Jones Act incorporates by reference the Federal Employers' Liability Act (FELA), which has a three-year statute of limitations. 45 U.S.C. Sec. 56
 
 
 [4]
 Federal Rule of Appellate Procedure 28(j) provides that if "pertinent and significant authorities" come to a party's attention after its brief is filed or after oral argument, but before an opinion has been rendered, the party may "promptly advise the clerk of the court, by letter, with a copy to all counsel, setting forth the citations."
 
 
 [5]
 45 U.S.C. Sec. 51 et seq
 
 
 [6]
 46 U.S.C.App. Sec. 688 provides that "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply" to Jones Act seamen
 
 
 [7]
 On reconsideration, the court declined to rehear the case en banc, but modified the original opinion, stating that a Jones Act plaintiff may recover for serious mental distress assuming an "actionable injury." Hagerty, 797 F.2d at 256
 
 
 [8]
 Because we find that Wilson has asserted tortious physical contact and physical injury, we need not reach the issue of whether a purely emotional injury would be cognizable under the Jones Act
 
 
 [9]
 A defendant's motion for directed verdict on a seaman's claim under the Jones Act is reviewed under the strict standard applied in FELA cases. Thornton v. Gulf Fleet Marine Corp., 752 F.2d 1074, 1076 (5th Cir.1985). Taking an issue away from the jury is appropriate only when there is a "complete absence of probative facts" to support a verdict in favor of the plaintiff. Id. (citing Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 743, 90 L.Ed. 916 (1946) (FELA case)). However, a Jones Act or FELA plaintiff has the burden to prove that her cause of action was commenced within the three year limitations period. Crisman v. Odeco, 932 F.2d 413, 416 (5th Cir.1991); Emmons v. Southern Pacific Transportation Co., 701 F.2d 1112, 1117-1118 (5th Cir.1983). Where under the undisputed material facts a plaintiff has not carried this burden, we have not hesitated to sustain a directed verdict or summary judgment against the plaintiff on the limitations issue in a Jones Act or FELA case. See, e.g., Crisman, 932 F.2d at 417; Armstrong v. Trico Marine Inc., 923 F.2d 55, 58 (5th Cir.1991); Clay v. Union Carbide Corp., 828 F.2d 1103, 1107 (5th Cir.1987); Albertson v. T.J. Stevenson & Co. Inc., 749 F.2d 223, 233 (5th Cir.1984)
 
 
 [10]
 Coverage under the LHWCA is limited to "employees," defined as follows:
 "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and a ship-breaker, but such term does not include--
 "....
 "(G) a master or member of a crew of any vessel...." 33 U.S.C. Sec. 902(3).
 The test to determine "member of a crew" status under the LHWCA is the same as the test for "seaman" status under the Jones Act. Barrett v. Chevron U.S.A., Inc., 781 F.2d 1067, 1070 (5th Cir.1986). The Administrative Law Judge determined that Wilson was a seaman, and accordingly denied her claim.
 
 
 [11]
 The LHWCA provides that, in cases of covered employment, the employer is liable for and is bound to secure the payment of compensation payable under the provisions of the Act resulting from a covered injury irrespective of fault. 33 U.S.C. Sec. 904(b)
 
 
 [12]
 The parties apparently engaged in an informal charge conference as an ongoing process occurring during several recesses throughout the trial. Near the end of the trial, the court explained the procedure by which it would take formal objections:
 "What I am probably going to do is order you to make your objections to the charge on grounds of insufficiency of the evidence and all of those kinds of things, omissions. And after the jury retires and then you will object to that, and I will overrule the objections so that there is no chance of anybody saying you waived it by consenting to a bizarre practice. But given the lateness of the hour, I think we ought to go ahead and get it argued, and I will take your objections.... But the ones for the record, to preserve the points for later motions, we can do later."
 Just prior to closing argument, the court asked whether the charge contained any "other typing or omission defects." Plaintiff's counsel responded, "We see none, Judge. We have got some objections and we have gone over them before. I understand you want us to do them later." The court replied, "I order you to do them later." Following closing argument, and during jury deliberation, the court entertained formal objections by both parties to the entire charge.
 
 
 [13]
 Special interrogatory number 1 defined "injury" as
 "damage to the structure of the body, including diseases that naturally result from the harm. An emotional affront, without physical impact, is an injury if it has serious consequences similar to those resulting from a physical injury."
 
 
 [14]
 The only objection at trial made with respect to special interrogatory 9 or proposed instruction P-15 was as follows:
 "There is no objection to question number 9, except we believe that Plaintiff's instruction P-15 on aggravation should have been given to adequately instruct the jury on aggravation, since the court was limiting us to post August 5 of '84, acts and omissions and conditions of the vessel."
 In fact, the court did instruct the jury on aggravation, by including within interrogatory number 9 the following:
 "Do not include any amount for any condition existing before August 5, 1984, except to the extent that the other condition was aggravated. The worker who is more difficult to cure because of an earlier injury is entitled to compensation for the full cost of the results of the current injury."
 
 
 [15]
 Wilson makes much of the fact that the affidavits were not stapled to the underlying records. However, Wilson does not seriously contend that she was misled as to whether such affidavits existed or whether they were intended to establish the foundation for admitting the records. Accordingly, we find this argument to be without merit